Good morning, Your Honors. May it please the Court, my name is John Fay and I represent Noranda Alumina, L.L.C. We filed this appeal because we believe the sanction of dismissal was, in the words of the Fifth Circuit, draconian in the circumstances of this case, where there was only one discovery order that was very substantially complied with and no, if you will, second chance. And instead of the Court taking a potential sanction of first resort, it resorted to the sanction of last resort and dismissed the case. The Fifth Circuit . . . Weren't there several efforts, particularly regarding these three engineering reports? Your Honor, the issue, and that seems to be the focus of the District Court's decision of why they characterized Noranda's responses as willful or in bad faith. What we pointed out to the judge before he issued the dismissal order is that we were talking about reports that were, I believe, five to six to seven years old at the time. I had gone to Noranda and met with half a dozen of their representatives to obtain documents. I obtained a great deal of documents and produced those and included in those were many reports and documents and photographs that showed the same conditions or at least some of the same conditions that were noted in these three reports. I would also point out the three reports in question, if I'm remembering those correctly, those dealt more overall with the entire dock structure. I think even one of them was a soils engineer report. This structure that is the object of the case is a steel fender system. It's basically a checkerboard of steel structure that sits on the face of the dock itself. The concrete dock being kind of like a parking lot, concrete slab parking lot sitting atop numerous steel structures. My recollection is that the three reports in question dealt more with an overall evaluation of that entire structure. The more detailed reports and photographs that we produced, of which there were at least six other reports that were produced, that deal specifically with the fender system that is the subject of this claim. So while we can see that in the search for the records and my visits to the company to obtain the records, we didn't obtain those three reports associated with obtaining them through subpoena ducis tecum that they submitted to engineers, local engineers in the area, and that's how they obtained those three specific reports. You said you only had one chance, I think at the outset of your remarks, but I assume you mean by the court. There was one order by the court, by the magistrate judge, but in the meantime, opposing counsel has repeatedly asked for documents or deposition dates or other things to advance the litigation. Isn't that correct? There were numerous requests, yes, Your Honor, that led to the initial motion to compel, and that's correct. I mean, how many times does the court have to ask other than once, or I should say order, not ask, more than once? Well, and not more than once, I would say. But what we did when we obtained the magistrate's first order, we endeavored to comply with that order. And unlike the numerous, I think uniformly, the circumstances that existed where this court and the district courts in this circuit addressed this situation, the draconian remedy or the draconian sanction of dismissal was only warranted in cases where there was a complete disregard. We did not completely disregard the magistrate's order. We produced hundreds and eventually up to 2,000 pages of documents that were responsive and provided the defendant the information that he needed to prepare his defense for the case. Let me ask, too, because this is the second time you said it would be dismissal, such as happened here would be a draconian sanction, and I think you're talking about the jurisprudence from the circuit that uses that term. But what's the status of Noranda? I assume you're suggesting that a lesser sanction would have been more appropriate to get the attention of either Noranda or, pardon me saying, or you, to whatever extent there's not compliance with the discovery. But Noranda, as I understand it, is you were saying, would there be any response to a monetary sanction? Are they able to respond at all? Well, the subsequent owner, Gramercy Holdings, was going to be in the case. And it is true that when the magistrate in his reasons and recommendations mentioned that, it actually kind of took me a bit by surprise because prior there had been the issue came up during the settlement discussion that we had with the magistrate in November. And I did represent Let me get back to it. I'm interested in what you're saying, but my question is, was there an ability of the offending person, the noncompliant party or attorney in this case, to respond financially? If the magistrate had said, you're not complying with discovery timely and sufficiently, I'm therefore going to, under Rule 37, assess a financial penalty, was your client at the time, Noranda, the record plaintiff, able to respond by paying such a penalty, if that's the less drastic sanction you're suggesting? I don't believe that Noranda itself was in that position, Your Honor. Okay. We would urge, Your Honors, that in the circumstances where, in this case, that were extremely different from the cases where the dismissal sanction was upheld or validated, are very different from the case here where we did comply substantially with the court's order. You will note that in the associated submissions, they spend a great deal of time arguing the defense of the case, that the reason the dock failed was because it was in poor condition. Those arguments are all based primarily on documents that we obtained and produced to them, so we would suggest that any specific questions, of which there were a very small number compared to the large number of requests that were made, the defendants had the information they needed to defend the case, and the fact that we produced documents showing poor conditions and the same information that was in the reports that we overlooked shows that there was no conduct on Noranda's part or my part that was either willful or in bad faith, and that those components are required to support a dismissal sanction. For those reasons, Your Honor, we would ask that the district court decision be reversed. Let me ask, what other lesser sanction do you think, assuming, and I realize that you may disagree that there should have been a sanction at all, what other lesser sanctions would have been appropriate in this case short of dismissing the case and then assessing or assessing a financial penalty? Well, certainly the financial sanction would be the one that most courts would resort to, but I think I would jump to your first suggestion about whether in this circumstance a sanction was appropriate at all. I could see a sanction if, like in the other cases that courts have addressed this issue in where the requests are submitted, no response, motion to compel is filed, no response, counsel doesn't attend court conferences and other proceedings that the court sets, and just completely disregards the requirements of the court. That wasn't the case here. We spent great effort to try to get the documents and get the discovery to the defendant, and so we've all been in cases where, on the other side, where the discovery has been difficult to obtain and judges, you know, issue multiple orders to compel the discovery, and it's not until usually several have been violated that a sanction of any kind is imposed. And I guess I, you know. Mr. Blake, if I may, what's your best case or cases from our circuit that support your argument that this sanction was not appropriate? Well, I think I would refer Your Honors to mostly the cases that are cited in Associates' brief that discuss the remedy as being a remedy of last resort and a draconian result, if you will, that requires willful conduct or bad faith conduct that is manifested by a complete disregard for the court's orders and its other proceedings. I think one of those cases is Carter v. Dialysis Clinic, 234 Fed 3rd, 707. The Davis case at 2008 U.S. District, Lexus 106108. Moore v. Comer, 2017 U.S. District, Lexus 156877. And Wilson v. James Industry, 2016 U.S. District, Lexus 181663. Thank you. All right. Thank you, Mr. Fay. You've saved time for rebuttal. Mr. McShane. May it please the Court, good morning, Your Honors. I'm Pat McShane. I represent Associated Terminals, LLC, along with my partner, Katie Rice, who's at Council Table. Your Honors, we've had a couple years of high water in the Mississippi River and the New Orleans Harbor, and we're doing a good bit of property damage involving docks. One of the things that we know is it's a tough place to have a dock because of how difficult the conditions can be on the river, especially when we have multiple high years like this. So we've refined our discovery responses from the various cases that we've handled, and we do have very detailed and precise written discovery devices relating to claims by dock owners that they sustained property damage because of our vessel operator clients. So some of it can be tough. How to read a P&L statement, that's not my strength. Business losses, that's not my strength. I understand these concepts, though, when you get to the real property damage part of these cases. Depreciation. Did the repairs involve betterment? What was the condition of the dock before you claim we damaged it? And what were you thinking about your maintenance schedule and how you needed to proceed to maintain or replace this dock? So our discovery devices are oriented to those essential questions of a maritime property damage case. We first propounded our discovery when the Noranda v. Associated Terminals matter was pending in the Noranda bankruptcy proceeding in St. Louis, Missouri. The devices, interrogatories, and requests for production were duly propounded and became due with no objections and no answers being filed. As Judge North wrote in his recommendations, look, that was kind of a tricky procedure, and maybe it's excusable because the procedural posture was unusual. We were all thinking as a New Orleans lawyer, boy, I'd love to see this part of the bankruptcy proceeding get sent back down to New Orleans where I feel a little bit more at home. So there wasn't high pressure to answer this discovery while I was in the Missouri proceeding. But as Judge North noted, by the time in May of the following year we began to ask for the discovery, when it got sent back down here, the lack of response, which was complete and total lack of response, was no longer excusable. And I'm not going to go through the detailed chronology because it's very precisely laid out in Judge North's recommendations, and we've read them and agree that he's got it stated with absolute correct precision. But what I will say is that our effort to get this discovery began and continued through the summer with informal and collegial requests, ultimately followed by a motion to compel filed at the end of the summer that led to the hearing in August before United States Magistrate Judge Michael North. This was the type of motion to compel scenario that we don't usually confront. Usually when we bring a motion to compel, it's because there are objections and we want to argue to and fro about whether the objections are valid, or there are responses and we want to argue about whether we are entitled to more documents. In this case, we went to the motion to compel hearing with zero responses having been provided to us. The judge provided counsel with a short period, 10 days or 14 days, to answer, and at the point that the answers came in, we had some papers described in the appellant's brief as, look, we gave some information, that's right. But what was not there was the engineering information that we need. We're focusing on depreciation, betterment, what's the condition of the dock? We asked for engineering reports. We also asked for depreciation schedules, video footage of the dock which we knew existed, protocols for inspection and maintenance, permits and licenses for the dock, board meetings discussing replacement schedules. This is not just the engineering reports. Through several supplemental responses in the autumn of that year, we never got any engineering information from Miranda. To listen to Miranda say that there has been a substantial compliance with the discovery when no engineering data was supplied, and no information meaningful to our ability to calculate the depreciation issues and betterment issues that go to the essence of the case. We then found engineering evidence. And by that I mean we canvassed the engineers up and down between Baton Rouge and New Orleans. It's a pretty small community of engineering support for the various terminals along that area. And so we know what seven or eight places to go to look for information, and we canvassed. That's how we found the engineering evidence. The engineering evidence is summarized in Judge North's recommendation opinion. It is extremely compelling. There is Lanier engineers, they say they recommended phasing out the dock and that the dock, which is there to hold a crane to unload barges, could no longer safely hold the weight of a crane. The Ragland report noted fatigue, corrosion, construction deficiencies, and said we cannot predict whether you will have joint failure of this dock. The Eustis engineering report documented that the structure was 35 to 50 years old and that it was a 53-year-old dock and said that the dock needed to be replaced. Counsel, your point is that you didn't get this from the other side. I didn't get it from the other side, but in terms of prejudice, what I would say, Your Honor, my point is now this. The weight and strength of the evidence when you have engineering evidence from the other side, generated outside of a litigation setting that says the dock has passed its useful life and there can't be any more damage, that's where the essence of the prejudice was in this case. We never got the engineering data from Noranda, not within the order deadline from Judge North. We were past the discovery deadline. We were within a week or two of the originally set trial date, which got bumped because Judge Barbier developed a calendar conflict. We would have gone to trial in this case two weeks later without knowing of the existence of the engineering expert opinions generated by Noranda's own experts outside of litigation. When I say the evidence can't be overstated, it's being suggested we weren't prejudiced because we could hire our own experts to look at the photographs and documents that had been produced by the other side, and our litigation expert could take the witness stand and say, in my opinion, the dock had exceeded its useful life. And he would be subject to cross-examination to show the things, the courtroom bias, how much are you being paid, and how many times has McShane hired you. These experts aren't like that. These experts, in my judgment, the opinion of these experts is dispositive, and so that shows the high nature of the high level of prejudice of not having this information. And the fact that we could have ended up proceeding to trial without these documents being provided by the other side, had we not gumshoed and searched for this evidence, demonstrates the willfulness, which is one of the elements I'm going to get to when I start talking about the elements of Rule 37 and Rule 41. But to paint the picture of the nature of the prejudice, this is win-the-case type nondisclosure. And it fits with what I'm going to tell you in the end here, is that everybody knew this dock was dilapidated. That's why my client was there. We were hired to come in and bring a crane barge in to assist in unloading cargo barges, because the cargo facility was too dilapidated to do it on its own. Benefit of hindsight, if my client had to hold harmless when they went in there, we wouldn't be here today. But we were called upon to assist them to deal with problems associated with the fact that this dock was dilapidated in the first instance. When you look at whether dismissal under Rule 37 or Rule 41 is the right remedy, there are elements that I'm going to discuss, but the essence of this comes from a directive in the Supreme Court in the case called Insurance Company of Ireland, where the court said, ask yourself this question, was this dismissal just? I want to demonstrate to you that to allow this case to proceed, based on what happened over the course of a full year, would, in our view, be a miscarriage of justice, and that, therefore, the decision made by Judge Barbier to accept the recommendations of United States Magistrate North was entirely appropriate and should be withheld. The elements under Rule 37 of the Federal Rules of Civil Procedure, which dictate whether a decision by a district court judge to dismiss a case for discovery sanctions was an abuse of discretion, which is the standard, are, was the bad behavior, the abuse, in bad faith or willful? Did it cause prejudice? And then when you think about the dismissal and whether it's warranted, is it the, this is a sanction of last resort, and is there any other available sanction? And is it draconian? So I want to talk about each of those. Judge North, the magistrate in the case, was credited in Judge Barbier's opinion with having an intimate knowledge of what had transpired during the discovery process in this case. And Judge North, in his footnote 5, said, Noranda pleads its good faith three times in the first page of its opposition memorandum. These incantations cannot overcome facts that say otherwise. And the facts that were compelling to the judge, he said what was really troubling on the willful issue was the unacknowledged deficiencies. So it's not really a question of did you give me 2,000 pieces of paper. It's I'm looking to win this case by showing that your dock has already exceeded its useful life. And you have engineering reports that say that it has, and you don't give them to me. And even when I get them from a third party and I have a motion to dismiss, you still don't give them to me. Judge North focused on an exchange between Noranda's counsel and himself in the hearing before the magistrate where we are now at a motion to dismiss phase. We file a motion to dismiss saying they should have given us these records. And in the ordinary course, what I would want to do to oppose that is go back out and meet with my client and say we have to explain what we did. It may be, look, the engineering records were in the yellow folder. Shame on us. We only looked in the green, red, and blue folders. Here's an affidavit. That didn't happen here. We're in a motion to dismiss setting. And Judge North asked counsel, what happened here? What happened here? And the answer on the record cited in Judge North's opinion is, I can't explain it. And this is the point of emphasis for us. We're not casting aspersions at Mr. Fay. We're not questioning his integrity. We have known him for a long time, and we hold him in high regard. What he said was, I went with the discovery devices to my client, and I went through them one at a time. I need this, this, this, and this, and they didn't give me this stuff. And I don't have an explanation. And at that phase in a motion to dismiss to offer no explanation was relied upon by Judge North to say that supports a finding that they don't have one other than this was deliberate and willful and in bad faith. That's the finding of bad faith. I'm not measuring this by some test of whether there was a meaningful response. I would submit without the engineering reports being provided that there is no meaningful response. Without the depreciation schedules and the maintenance schedules and the internal communications and the board records, that's not a meaningful response. I'm not interested in how many pages I get. So was it willful and in bad faith? Judge North found that it was bad faith and focused on the lack of explanation in the hearing, and Judge Barbier accepted that recommendation, which we submit was correct. Were we prejudiced? I think I've made my argument about that. We would have moved for summary judgment with their records that the structure outlived its useful life, and I believe we would have won that. And then is there another remedy here short of dismissal? And Judge North reasoned that there was not because Naranda was not capable of meeting any financial penalties, and short of dismissal, Judge North saw no other available remedy, and I think that was the correct decision. Then this isn't really part of the test, but it kind of blends or spills over into is this a remedy of last resort? The description of this remedy is a draconian remedy. This remedy was addressed by Judge North, even though it's not really an element of the test, and he said, I don't really think it's draconian to dismiss a claim that's being asserted by someone who now admits doesn't have entitlement to assert the claim, and that had to do with the fact that Naranda, after it came out of the bankruptcy, this claim, through some process that we never discovered, and I don't know whether this is accurate or not, but the contention is that Gramercy Holdings now owns this claim. Judge North said, well, then dismissing the Naranda claim is not draconian, and he gave a period of time for Naranda and Gramercy Holdings to substitute, a period through January 26th. Naranda says their counsel was out of the country through January 10 through 20, had computer problems. Judge North said, well, that's fine, but you had until the 26th. I think that may have been in Judge Barbier's opinion, actually. You had six days after you got home, too, to do this. So not draconian. Judge Barbier found that this amounted to a violation of the Federal Rules of Civil Procedure, a pattern of abusive discovery practice, noncompliance with the court order. There's some suggestion in the briefing from Naranda that noncompliance with only one court order shouldn't lead to a dismissal. Importantly, there are more than one court order here. There's the discovery order, and there is also the scheduling order, the Rule 16 scheduling order, because we went up to a week before trial. The discovery deadline passed with suggestions, oh, I'm still looking, I'm still organizing, we'll have some more papers for you. Hey, we got a trial, and we have a Rule 16 scheduling order that governs the trial, and it includes a discovery deadline, and to say that you're still working on it after the discovery deadline is a violation of the second order to the extent that anyone would conclude that that's an operative legal issue. The Rule 41 dismissal, some of the factors are similar, but one of them is, I think I've touched on this, but was the delay caused by the actual litigant or by the attorney? Let's don't overly punish the litigant if it was some malfeasance by their lawyer. And again, I would direct the court to the exchange in the magistrate's motion to dismiss conference where counsel for Naranda said, I can't explain why my client didn't give me these engineering reports when I went through the discovery devices with them. So once again, we are not laying this at the feet of counsel. We are laying this squarely at the feet of Naranda, and we are claiming that this was a deliberate, willful concealment of the engineering evidence. Rule 41 asks, were you prejudiced? I've covered that, and I think I've demonstrated it. And was the delay caused by intentional conduct? One of the operative points there that Judge North and Judge Barbier focused on was that at the motion to dismiss stage, we're five months after the deadline to comply with Judge North's order, and we still don't have the engineering records. By the way, the three engineering reports that's established in the record below were all addressed to a single person at Naranda, and we have been asking for his deposition for months, and we've been stonewalled on the deposition request, which is further evidence that they were trying to keep this from us and see if they could get to a trial. Judge Barbier called it a flagrant disregard for the discovery process and willful and intentional conduct. So just for context, when I began my involvement in this matter, I was hired to deal with this property damage claim while the case was in Missouri and went up and was involved in some of the litigation and the bankruptcy proceeding. I'm not a bankruptcy lawyer, but I was involved in this aspect of the case. At the time of the bankruptcy, Associated had a claim, unsecured claim for $1.3 million, which was discharged in bankruptcy, as Naranda had a right under the governing law to do. But Naranda came to us and asked, look, we're trying to stay in business. I know that you're out $1.3 million. We can get a court order where we can be allowed to pay you for our post-petition work. We need your help. Will you help us? And we did. We put our crane barge back in there. This is when this claim arose, post-petition bankruptcy. We are there helping them stay in business. We had damage to our crane barge when it was there because the dock was falling apart. We put Naranda on notice of the crane barge damage. We sought payment for the money for our services, and Naranda responded saying, you've damaged the dock, and they refused to pay for the post-petition services that we were providing to help them stay in business, arguing that this dock damage claim entitled them to set off. This is at a time when everybody knows that the dock is debilitated, and they're claiming $1.3 million in damages for a dock that their own engineers have told them has outlived their useful life, and they're using that as a cat's paw to not pay us the money that they owe us in bankruptcy. So the manipulation and the scheming by Naranda, we feel like enough is enough, and the relief that we ask is this. Because the clear record of delay in this case is attributable to willful misconduct, and because the acts clearly prejudiced associated terminals, substantial discovery sanctions are appropriate here. A lesser sanction, a monetary sanction, would not work. Naranda has no money, and associated cannot squeeze blood from a turnip. Both Judge North and Judge Barbier concluded no lesser deterrent would better serve the interests of justice. Judge Barbier said the discovery problems here undermined and were an affront to the interests of justice. A dismissal is not draconian. Naranda doesn't even own the claim. Failure to substitute is not merely owing to international travel. It's time for substitution ran after counsel's return to the U.S. This case presents the sort of, quote, discovery fiasco, close quote, that the Fifth Circuit has previously said merits a dispositive sanction. That's United States versus $49,000 in currency. The decision of the lower court dismissing this case pursuant to Rule 37 and Rule 41 of the Federal Rules of Civil Procedure with respect should be affirmed. Roberts. Thank you, Mr. McShane. Mr. Fay, you've saved time for a vote. Mr. McShane spent a good deal of his argument representing to the court that despite requests, the engineering reports and maintenance records were not produced to them. We suggest that is not accurate. The three specific reports that were referred to by Magistrate North obviously were not among the documents, but there were no less than six reports that are in the record showing the various construction schematics. This one from James Ragland, the engineer describing the conditions of the fender. Mr. Ragland being the author of one of the reports that Mr. McShane is referring to that wasn't produced. Counselor, are you saying that your client produced those? Yes, I am, Your Honor. I don't have the record excerpt numbers right now, but they are record document 36-2, 36-3, 36-4, 36-5, and 36-6 in the district court record. I'd be happy to send the court a letter to identify the record excerpt numbers. But these are from the very engineers and, Noranda, internal engineers that describe the specifics of the fender. Mr. McShane, I believe, made my point when he said that these three missing reports dealt with the dock and that the dock was on the verge of not being able to support the machinery that was on the dock itself. Didn't mention anything about the fender system that is attached to the face of the dock. These reports detail the conditions of those docks, of the fender. We produced original construction drawings showing the original construction of the dock. We produced numerous maintenance records showing each time that Noranda made improvements or repaired steel in the fender. Were those items produced voluntarily or only after the hearing on the motion to compel? They were produced after the hearing on the motion to compel, Your Honor. Why weren't they produced beforehand? Surely there was not an objection of relevance, was there? No, there wasn't. It was just the logistics of me getting up to Gramercy and sitting down and getting commercial people to sit down and deal with litigation, which, in my experience, I've had a hard time to do. Commercial people who are being driven to do more with fewer people have demands on their time, and despite efforts, I had to basically go up there and meet with them and go to each department and sit down and get e-mails and reports and so forth. So it was logistical, I would say. All right. So the documents that one of the category of documents that Mr. McShane referred to that he said he needed was things like depreciation schedules, which are driven by tax concerns that don't impact the damages issue that he referred to. Clearly, the age of the dock, the construction, what it's made of, the environment it's in, the service that it's in, all of those are clearly reflected in the substantial number of documents that we did produce in response to the order, compelling production of those documents. With that, Your Honors, we would suggest that Noranda's conduct was not willful, that we made good-faith efforts to respond with the documents and the responses that Associated needed to respond and defend the claim, and we ask that the district court order be reversed. All right. Thank you, Mr. Fay. Your case is under submission.